UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
JOANNE FRATELLO,

                      Plaintiff,

                - against -

ROMAN CATHOLIC ARCHDIOCESE OF NEW YORK,
ST. ANTHONY'S SHRINE CHURCH, and
ST. ANTHONY'S SCHOOL,

                    Defendants.
-------------------------------------------------------------------x

**OPINION AND ORDER**

No. 12-CV-7359 (CS)

<u>Appearances</u>:
Michael D. Diederich, Jr.
Stony Point, New York
*Counsel for Plaintiff*

Kenneth A. Novikoff
Barry I. Levy
Jacqueline Siegel
Rivkin Radler LLP
Uniondale, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

      Before the Court are Defendants' Motion for summary judgment, (Doc. 90), and

Plaintiff's Cross-Motion to strike Defendants' ministerial-immunity defense, (Doc. 103).  For the

reasons set forth below, Defendants' Motion is GRANTED and Plaintiff's Motion is DENIED.

# I.  **BACKGROUND**

      The following facts are based on the parties' Local Rule 56.1 statements[1] and responses

thereto, and supporting materials, and are undisputed except where noted.

---

[1] "P's Counter 56.1" refers to Plaintiff's Response & Counterstatement to Defendants' Rule 56.1 Statement, (Doc.
108).  "Ds' Counter 56.1" refers to Defendants' Response and Counter-Statement to Plaintiff's Rule 56.1 Statement,
(Doc. 115).  The parties, particularly Plaintiff, included blanket denials, legal arguments and/or hypertechnical or

Plaintiff Joanne Fratello is a former principal of St. Anthony's School (the "School"), a Catholic elementary school located in Nanuet, New York.  (*See* Ds' Counter 56.1 ¶ 13; AC ¶¶ 1, 12, 13, 19.)[2]  Defendants are the Archdiocese of New York (the "Archdiocese"), St. Anthony's Shrine Church and the School.  (AC ¶¶ 2, 5, 7.)  Plaintiff served as principal of the School from 2007 until 2011, when her contract was not renewed for the 2011-2012 school year.  (Ds' Counter 56.1 ¶¶ 11, 21, 106.)  Plaintiff alleges that the decision to terminate her employment was the result of gender discrimination and retaliation, and she now seeks relief in this Court.  (AC ¶¶ 12-16.)

## A.  Factual Background

The School, which is chartered under the laws of New York, is run by the Archdiocese. (Ds' Counter 56.1 ¶ 31; AC ¶¶ 34-38, 114.)  Before addressing the specifics of Plaintiff's employment, it is useful to examine the Archdiocese's and the School's mission statements and manual, as well as the role of its principals in the abstract.

### 1.  The Mission and Manual of the Archdiocese of New York and St. Anthony's School

The website of the Catholic Schools in the Archdiocese of New York proclaims that its mission is "to ensure [its] schools are Christ-centered, academically excellent, and welcoming communities that teach students to be life-long learners and leaders energized by fidelity to

---

inapplicable objections in their responses to the other party's Local Rule 56.1 Statement.  As counsel knows, "[f]ailure to specifically controvert facts contained in the moving party's Local Rule 56.1 Statement, or failure to support any such response with record references allows the Court to deem the facts proffered by the moving party admitted for purposes of a summary judgment motion."  *Edmonds v. Seavey*, No. 08-CV-5646, 2009 WL 2949757, at *1 n.2 (S.D.N.Y. Sept. 15, 2009); *see also Montauk Oil Transp. Corp. v. Sonat Marine Inc.*, No. 84-CV-4405, 1986 WL 1805, at *8 (S.D.N.Y. Feb. 3, 1986) ("[R]eliance on legal conclusions – unsupported by specific facts – and general denials does not create a genuine factual dispute under Rule 56.").  Plaintiff in particular in her 56.1 response followed the circular practice of disputing a proposition set forth by Defendants without pointing to contrary evidence except her own affidavit, which did not address the issue but rather stated in blanket fashion that all responses to Defendants' 56.1 statement were accurate.  This does not, in the Court's view, amount to specifically controverting the proposition.  Nevertheless, in an excess of caution, I have not, in deciding these Motions, relied on any facts the parties purport to dispute.  Had I held the parties strictly to the requirements of Federal Rule of Civil Procedure 56 and Local Rule 56.1, it would only have strengthened my conclusion.

[2] "AC" refers to the Amended Complaint, (Doc. 9).

Christ, the Church, and one another."  (Novikoff Decl. Ex. A, at 2-3.)[3]  The Archdiocese's

website further describes the "Catholic school experience" as follows:

> Our Catholic faith is central to what we do, and we proudly teach it.  Gospel
> ideals permeate the substance and structure of our lessons.  We share our faith
> through daily prayer and the regular celebration of Mass as a school community.
> We foster a spirit of Christian service as an expression of our concern for the
> needs of others.  Character formation and personal spirituality are rooted in the
> study of Catholic teachings and tradition, as well as sacramental preparation.  Our
> academic programs grounded in basic skills meet the varied needs of each school
> community by incorporating technology, advanced math, hands-on science, and
> foreign language coupled with the various forms of art study.  We offer a
> forward-focused curriculum, integrating technology into classroom instruction,
> preparing our students to compete in an increasingly complex world.

(*Id.*)  Similarly, the School's mission is to "provide a high-quality, educational experience that

enhances each child's spiritual, emotional, intellectual and social growth.  Our faculty and staff

prepare our students to become future leaders and responsible stewards of God's creation."  (*See*

Ds' Counter 56.1 ¶ 7.)  Religion is a central part of the School curriculum.  (*See* P's Counter 56.1

¶¶ 92-97.)  At the same time, the School is required, by law, to provide its students with an

education substantially equivalent to that of public schools.  (Ds' Counter 56.1 ¶ 72.)

The Archdiocese disseminates an Administrative Manual (the "Manual") that delineates

policies and procedures for principals and other administrators.  (*See generally* Admin.

Manual.)[4]  In a cover letter for the Manual, addressed "Dear friends in the Lord," Edward

Cardinal Egan, Archbishop of New York at the time of the Manual's issuance, wrote to

principals:

> As principals in the schools of the Archdiocese of New York, you are providing
> splendid leadership to your teachers and staff and excellent academic and spiritual
> formation to your students.  This is demanding work, and I am deeply grateful for
> the wisdom and devotion with which you do it.  With each passing year, it

---

[3] "Novikoff Decl." refers to the Declaration of Kenneth A. Novikoff, (Doc. 91).

[4] "Admin. Manual" refers to Exhibit A to the Declaration of Mary Jane Daley ("Daley Decl."), (Doc. 94).

becomes more and more clear to our Catholic faithful and the community at large that we are all greatly in your debt.

This revised *Administrative Manual* is designed to assist you in the administrative tasks you must fulfill in providing the structure needed to carry out the vital work of Catholic education.  The updated sections and materials give evidence of the growing demands required to provide the appropriate learning environment, and [sic] environment which enables each of our schools to offer quality academic education infused with the Catholic Faith and values that are so needed by the young people who come to us.

. . . .

Again, I thank you for having accepted the vocation and challenge of leadership in Catholic education.  Be assured of my prayers and support for your work which is so crucially important to the Church in New York.

(Admin. Manual at 023753.)  Another letter within the Manual is addressed to principals from

Michael Ramos, Associate Superintendent of Schools for Professional Recruitment, and states:

"The Catholic school is essential to the Church in fulfilling its teaching mission. . . . .  It is your

responsibility as principal to establish a climate which is identifiably Catholic and which

nurtures the growth of teachers and students in all dimensions of life."  (*Id.* at 023923.)

The Manual also contains a job description for principals.  It states:

The principal is the leader of the school, a unique Catholic educational institution. The principal is responsible for achieving the Catholic mission and purpose of the school as well as the quality of teaching and learning that goes on in the school. S/he is the animator of the community of faith within the school. . . .

The principal must of necessity be involved in every aspect of the school operation.  The principal oversees the areas of religious education, curricula instruction, formulation and communication of school policy, supervision of personnel, staff recruitment and development, student recruitment, maintenance of school records, discipline and co-curricular activities.

(*Id.* at 023924.)  The Manual goes on to describe a principal's role in providing "Catholic

leadership" as follows:

The principal cooperates with the pastor in recruiting and maintaining a staff committed to the goals of a Catholic school; cooperates with the pastor in his religious ministry to the students; ensures adherence to the curriculum guidelines,

> *Guidelines for Catechists*, 1998; monitors the acquisition of catechetical
> certification for teachers of religion, directs the implementation of the religious
> education program, is committed to the mission of evangelization, involves the
> staff in formulating plans that enable the school to meet its religious goals;
> provides opportunities for student, faculty, and parent participation in liturgical
> and paraliturgical services; initiates programs that inculcate an attitude and foster
> the practice of service to others; motivates the students to take an active part in
> the life of the parish; promotes in faculty, students, and parents the concept of the
> school as a community of faith; provides opportunities for the practice of this
> concept; cooperates with the parish council by attending council meetings and by
> keeping the council informed of school matters.

(*Id.* at 023803.)  The Manual then lists a multitude of day-to-day responsibilities of the principal,

touching on "personnel management," "office management," "public and community relations,"

"budget and fiscal management," "teacher development," and "evaluation of students," among

other responsibilities.  (*Id.* at 023803-07.)

The Archdiocese's website presents a summary of the principal's role in its information

to prospective applicants for that post:

> The Archdiocese of New York seeks committed Catholics who can inspire and
> engage faculty, staff, parents and students in the pursuit of spiritual development
> and academic excellence.  These dynamic administrators should demonstrate
> outstanding educational vision, professionalism, leadership skills, organizational
> ability and interpersonal strengths to serve as Principals . . . .  Candidates must set
> high expectations and foster a culture of continuous improvement in which every
> member of the school community works collaboratively to ensure the holistic
> achievement of every student.

(Ds' Counter 56.1 ¶ 22.)

Principals are evaluated by faculty of the school and the church's pastor.  (P's Counter

56.1 ¶ 26.)  In addition to more secular criteria, a principal is evaluated based on whether he or

she "fosters a Christian atmosphere which enables . . . students to achieve their potential,"

"reviews school philosophy and goals with the staff in accordance with current Church

documents," and "gives priority to a comprehensive religious education program."  (Admin.

Manual at 023936, 023942, 023947.)  Additionally, principals are asked to fill out a self-

evaluation form.  (P's Counter 56.1 ¶ 26.)  The self-evaluation contains five questions, one of

which is, "What are my strengths in the areas of spiritual leadership, instructional leadership,

interpersonal relationships and management?"  (Admin. Manual at 023942.)

Twenty-three percent of Archdiocese students are not Catholic, and practicing

Catholicism is not an explicit job requirement for its teachers, although the Archdiocese may

give preference to practicing Catholics.  (Ds' Counter 56.1 ¶¶ 42, 44, 46.)  The Archdiocese

does, however, require that a candidate for the position of principal present a letter indicating

that he or she is a practicing Catholic.  (P's Counter 56.1 ¶ 21.)  The Archdiocese also states that

principals must complete the Level 1 and Level 2 Catechist Certification Program within three

years of attaining that position.  (Admin. Manual at 023808.)  The Catechist Certification

Program is an online course that "provides theological understandings, spiritual/religious

formation and catechetical methodology."  (P's Counter 56.1 ¶ 19.)  Plaintiff maintains that this

certification requirement was aspirational but not strictly enforced by the Archdiocese.  (*Id.*

¶ 18.)  Plaintiff also asserts that although she is indeed Catholic, her academic credentials are in

education, and she does not have formal training in religion or theology.  (*See* Ds' Counter 56.1

¶ 4.)

### 2. *Plaintiff's Employment As Principal of St. Anthony's School*

When Plaintiff applied for the principal position at the School, she was interviewed by

the Archdiocese's Principal Search Committee (the "Committee").  (P's Counter 56.1 ¶ 49.)

According to Cathleen Cassel, the Regional Superintendent for Rockland County for the

Archdiocese and a member of the Committee at the time Plaintiff was interviewed, the

Committee sought to hire principals with "strong Christian values" who were dedicated to

providing teachers and students with "instruction in religious truth and value, maintaining a set

of educational policies which are in conformity with the religious beliefs and moral standards of

the Archdiocese and further fostering an educational environment which teaches students how to

live in accordance with the teachings of Jesus." (Cassel Decl. ¶¶ 1, 5, 10.)[5]  Among the

questions asked by the Committee were some form of the following:  (1) What is your personal

relationship with the church?  (2) Why do you want to be principal of a Catholic school (as

opposed to a secular private school)?  (3) What is your relationship with the pastor and the

parents at the current school you work in?  (4) What do you think is a good religion lesson?

(5) What would you do at the school to implement communal prayer?  (*Id.* ¶ 11.)

     In 2007, Plaintiff signed a one-year "Lay Principal Contract" with the School, (Ds'

Counter 56.1 ¶ 12), subject to renewal annually.  The contract provided:

> The principal recognizes the religious nature of the Catholic school and agrees
> that the employer retains the right to dismiss principal for immorality, scandal,
> disregard or disobedience of the policies or rules of the Ordinary of the
> Archdiocese of New York, or rejection of the official teaching, doctrine or laws of
> the Roman Catholic Church . . . .

(*Id.* ¶ 16; *see* AC Ex. 14, at 2.)  The contract did not specify Plaintiff's responsibilities as

principal.  (AC Ex. 14.)

     Upon beginning her tenure as principal, Plaintiff implemented a new prayer system

within the School in order to get the students "more involved" in prayer.  (P's Counter 56.1

¶ 66.)  Every morning, an eighth grader would meet with Plaintiff, after which Plaintiff would

introduce him or her over the loud speaker, and the student would then recite a prayer.  (*Id.* ¶ 67.)

Plaintiff would then respond to the prayer by stating, "Praise to you Lord Jesus Christ."  (*Id.*;

Weber Decl. ¶ 8.)[6]  The student would then read another prayer over the loud speaker, following

which Plaintiff would recite the "Our Father" prayer.  (P's Counter 56.1 ¶ 67.)  In the afternoon,

---

[5] "Cassel Decl." refers to the Declaration of Cathleen Cassel, (Doc. 93).

[6] "Weber Decl." refers to the Declaration of AnnMarie Weber, (Doc. 95).

Plaintiff often recited over the loud speaker a "reflection" containing a spiritual message.  (*Id.* ¶ 68.)

Plaintiff's religious involvement with the student body varied depending on the time of year and corresponding holidays[7] and religious feasts.  In general, Plaintiff would often attend regular mass with the students or special services to celebrate holy days or religious sacraments.  (*Id.* ¶¶ 85-89.)  On Fridays in October, Plaintiff would honor of the Feast of Our Lady of the Rosary by reciting over the loud speaker a "Decade of the Rosary," which consists of the "Our Father" prayer, ten "Hail Mary" prayers, and one "Glory Be" prayer.  (*Id.* ¶ 69.)  Throughout October and May, Plaintiff would recite the "Prayer of the Rosary" over the loud speaker and, at the beginning of her tenure, advised the faculty at a meeting that she would provide rosary beads to any student or faculty member for the purpose of facilitating prayer.  (*Id.* ¶¶ 70-71.)  In honor of the Feast of St. Anthony, which is held in June, Plaintiff would plan a special ceremony at the School and would attend a Sunday mass attended by students and their parents.  (*Id.* ¶ 114.)  Thereafter, she would meet with students, their families and faculty, bringing with her a statue of St. Anthony which was prominently placed.  (*Id.*)  On or around September 11 each year, Plaintiff hosted a September 11 memorial prayer at the school, where she would recite prayers and Bible verses in front of a gathering of faculty and students.  (*Id.* ¶ 115.)

Plaintiff also regularly supervised teachers and their curricula.  Teachers were required to submit to Plaintiff each week a copy of their lesson plan books.  (*Id.* ¶ 91.)  She mandated that teachers' lesson plan books identify the objective of each lesson, the method by which it would be taught, and the "Value" and "Saint" associated with the lesson.  (*Id.* ¶ 93.)  The Value and Saint were to be based on a chart of Catholic saints and corresponding Catholic values that

---

[7] The parties disagree as to Plaintiff's regular involvement in various Christmas and Advent school activities.  (P's Counter 56.1 ¶¶ 72-81.)

Plaintiff handed out to teachers at the beginning of each school year.  (*Id.*)  Plaintiff generally expected teachers to relate Christian and Roman Catholic doctrine and teachings to students.  (*Id.* ¶ 94.)  She would also observe teachers and "sought to ensure that Catholic values were found within the classroom."  (*Id.* ¶ 97.)

In addition to reviewing teachers' curricula, Plaintiff would lead monthly faculty meetings at the School to discuss upcoming events.  (*Id.* ¶ 102.)  Each meeting began with a prayer led by Plaintiff.  (*Id.* ¶ 103.)  She also required that teachers attend a "Standards and Goals" meeting at the beginning of each school year, which she similarly led and began with a prayer.  (*Id.* ¶ 104.)

Another of Plaintiff's responsibilities was overseeing the drafting and dissemination of the St. Anthony's Monthly Newsletter.  (*Id.* ¶ 118.)  These newsletters often thanked families for joining her at a school-related mass or invited them to do so.  (*Id.* ¶ 121.)  The newsletters also often communicated to parents Plaintiff's joy and enthusiasm in joining with the students in their "spiritual" journey in finding Christ and thanked the parents for their help in facilitating the students' journey.  (*Id.* ¶ 122.)  Plaintiff used the monthly newsletter as a vehicle to, among other things, encourage the religious and spiritual learning and growth of the students outside of school and to remind parents of upcoming events of religious significance.  (*Id.* ¶ 123.)

At the end of each school year, Plaintiff would deliver religious messages to the graduating class.  At the graduation ceremony for the eighth-grade students, Plaintiff would present a speech.  (*Id.* ¶¶ 83, 124.)  These speeches often included religious language and prayer. For example, the speech to her final graduating class closed with the following:

Let us pray for the class of 2011.

Dear Lord:

> Bless these graduates as they go into the world to make it a better place.  While they pursue their dreams, gently guide them, lead them, show them your way to success and happiness through service to others as they maximize their own potential.  Fill them with joy as they reach their goals.  Strengthen them as they deal with life's obstacles and show them that every challenge is a path to character development.  Give them the intelligence to make their plans for their futures.  Give them the patience and persistence to pursue their ambitions.  Most of all, give them caring hearts to look for ways to help people on their life's journey.  Encourage them and lift them up now.  In Christ's name, we pray.  In the name of the Father, the Son, and the Holy Spirit.  God bless you.

(Weber Decl. ¶ 12; *id.* Ex. B.)  Plaintiff would also include a religious message for the graduating class in the School yearbook. Her words of advice to the Class of 2011 included the following:

> I was very confident that your spiritual, educational, and intellectual growth would have been achieved and you have proven that following Jesus's teaching along with the love and guidance from your parents, teachers and the community members that it was possible.
>
> . . . .
>
> As you leave our school family, may the God of peace protect you, equip you, and work with you, through Jesus Christ, to whom be glory forever and ever.  Amen.
>
> God Bless you always,
>
> Ms. Fratello

(Novikoff Decl. Ex. Q.)

Plaintiff was evaluated by the teachers at the School and by regional administrators.  In March 2008, Monsignor Reynolds, the pastor at St. Anthony's, rated Plaintiff as "Excellent" with regard to many criteria used to evaluate her abilities as a "religious leader" – for example, "fosters a Christian atmosphere which enables staff and students to achieve their potential," "gives priority to a comprehensive religious education program," and "encourage[es] communal worship."  (Novikoff Decl. Ex. J.)  Similarly, Sister Helen Doychek, then the District Superintendent of Rockland County, also rated Plaintiff as an excellent religious leader of the

school.  (*Id.* Ex. K.)  She commended Plaintiff for "renewing the Catholic Identity of [the

School,]" "setting a good example as a religious leader," "bringing a renewed sense of Christian

spirituality," "creating an atmosphere rich with a sense of Catholic Community," and "making

religious values, attitudes and behavior the focus of life at the School."  (*Id.*)  Many teachers at

the School used similar descriptions in evaluating Plaintiff's abilities as a religious leader.  (*See

id.* Exs. L-M; Ladolcetta Decl. ¶ 26; McGuirk Decl. ¶ 11; Driscoll Decl. ¶ 24.)[8]

### B. <u>Procedural History</u>

Plaintiff alleges that she first complained about the alleged discriminatory conduct to

others in the Archdiocese.  (AC ¶ 163.)  On October 12, 2011, Plaintiff filed a charge of

discrimination with the Equal Employment Opportunity Commission, (*see* Doc. 15 Ex. B),

which sent Plaintiff a notice of right to sue dated July 5, 2012, (AC Ex. 1).  Plaintiff commenced

this action within 90 days of the notice.

On March 5, 2013, Plaintiff filed her Amended Complaint, alleging that Defendants

engaged in gender discrimination and retaliation in violation of Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e *et seq.*, and section 296 *et seq.* of the New York State Executive

Law.  Plaintiff also asserted state-law claims for breach of contract and promissory estoppel, and

sought a declaratory judgment protecting her free exercise of religion.

On April 26, 2013, Defendants filed a motion to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6).  (Doc. 12.)  In a bench ruling, I found that I could not determine whether the

ministerial exception applied at the motion to dismiss stage because of the necessarily fact-

intensive inquiry that exception necessitates, and because Plaintiff had plausibly alleged that she

was not a minister, and had no religious training, duties or functions; that others handled all

---

[8] "Ladolcetta Decl." refers to the Declaration of Karen Ladolcetta, (Doc. 100).  "McGuirk Decl." refers to the Declaration of Carol McGuirk, (Doc. 99).  "Driscoll Decl." refers to the Declaration of Mary Ann Driscoll, (Doc. 96).

religiously related activities; and that she was simply a secular administrator doing what a public-school principal would do.  (*See* Doc. 54 Ex. A, at 10.)  I therefore directed the parties to engage in limited discovery on the issue.  (*Id.* at 10-11.)[9]

On July 16, 2015, the parties filed the Motions now before me, (Docs. 90, 103). Defendants seek summary judgment on all of Plaintiff's claims based on the ministerial exception derived from the First Amendment, (*see* Ds' Mem. 1),[10] while Plaintiff seeks "summary judgment striking Defendants' ministerial immunity defense" on the theory that she was simply a "lay principal" with secular, administrative responsibilities, (*see* P's Opp. 1-2).[11]

## II.  **LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

---

[9] I also dismissed Plaintiff's promissory estoppel claim in that ruling.  (*Id.* at 17.)

[10] "Ds' Mem." refers to Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment Dismissing Plaintiff's Claims on the Grounds that They Are Barred by the "Ministerial Exception," (Doc. 101).

[11] "P's Opp." refers to Plaintiff's Opposition to Motion for Summary Judgment, and Support of Cross-Motion to Strike Defendants' Ministerial Immunity Defense, (Doc. 107).

*Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where an affidavit is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).

III. **DISCUSSION**

The narrow question presented by the parties' Motions is whether Plaintiff's circumstances of employment cause her claims to fall within the ministerial exception, which would preclude her from bringing discrimination and retaliation claims against Defendants. The exception is an affirmative defense, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 709 n.4 (2012), and accordingly Defendants bear the burden of establishing it. "[W]hether the exception attaches . . . is a pure question of law which this [C]ourt must determine for itself." *Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 833 (6th Cir. 2015); *see Preece v. Covenant Presbyterian Church*, No. 13-CV-188, 2015 WL 1826231, at *3 (D. Neb. Apr. 22, 2015).

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and other employment discrimination laws ordinarily prohibit employers from discriminating against employees and from retaliating against those employees for lodging a complaint based on such discrimination. But First Amendment questions arise about the application of these antidiscrimination laws where the employer is a religious institution. *See generally Hosanna-Tabor*, 132 S. Ct. 694; *Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008). The U.S. Supreme Court considered the intersection of Title VII and the First Amendment in *Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*. That decision and the line of cases that followed govern the instant inquiry, and I examine them below before turning to the facts presented here.

**A.** *Hosanna-Tabor* **and Subsequent Case Law**

In *Hosanna-Tabor*, the U.S. Supreme Court held that "a 'ministerial exception,'

grounded in the First Amendment, . . . precludes application of [antidiscrimination] legislation to

claims concerning the employment relationship between a religious institution and its ministers."

132 S. Ct. at 705.  The Court reasoned:

> The members of a religious group put their faith in the hands of their ministers.
> Requiring a church to accept or retain an unwanted minister, or punishing a
> church for failing to do so, intrudes upon more than a mere employment decision.
> Such action interferes with the internal governance of the church, depriving the
> church of control over the selection of those who will personify its beliefs.  By
> imposing an unwanted minister, the state infringes the Free Exercise Clause,
> which protects a religious group's right to shape its own faith and mission through
> its appointments.  According the state the power to determine which individuals
> will minister to the faithful also violates the Establishment Clause, which
> prohibits government involvement in such ecclesiastical decisions.

*Id.* at 706; *see also Cote*, 520 F.3d at 204-05 (discussing several rationales for why, "[s]ince at

least the turn of the century, courts have declined to interfere [ ] with ecclesiastical hierarchies,

church administration, and appointment of clergy") (second alteration in original) (internal

quotation marks omitted).

The Supreme Court further confirmed, as the Second Circuit and "[e]very Court of

Appeals to have considered the question" had previously held, that the ministerial exception does

not apply only to "the head of a religious congregation."  *Hosanna-Tabor*, 132 S. Ct. at 707; *see*

*also Cote*, 520 F.3d at 206-07 (collecting pre-*Hosanna-Tabor* cases applying exception to

organist, music directors, press secretary and staff of Jewish nursing home).  The Supreme Court

was "reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a

minister."  *Hosanna-Tabor*, 132 S. Ct. at 707.  The Court instead thoroughly examined the

"circumstances of [the plaintiff's] employment" and delineated a number of factors on which it

relied in concluding that the ministerial exception applied in her case.  *Id.* at 707-10.

The Court first examined whether the employee, Cheryl Perich, was "held out" by her employer, a parochial school, as a minister, "with a role distinct from that of most of its members." *Id.* at 707.  Perich was a "called" teacher, meaning she received a "diploma of vocation" that granted her the title "Minister of Religion, Commissioned." *Id.*  She was tasked with performing that office "according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures." *Id.*  Her "skills of ministry" and "ministerial responsibilities" were periodically reviewed by the congregation. *Id.*  The Court found that for these reasons, the church and school "held out" Perich as a minister. *Id.*

The Court next looked to Perich's title – that of "Minister of Religion, Commissioned." Aside from the obvious fact that her title included the word "minister," this title reflected a significant amount of religious training and formal process.  She had to complete "eight college-level courses in subjects including biblical interpretation, church doctrine, and the ministry of the Lutheran teacher." *Id.*  Additionally, Perich had to obtain the endorsement of her local church council "by submitting a petition that contained her academic transcripts, letters of recommendation, personal statement, and written answers to various ministry-related questions." *Id.*  Finally, Perich "had to pass an oral examination by a faculty committee at a Lutheran college." *Id.*  All in all, it took Perich six years to fulfill these requirements.  "And when she eventually did, she was commissioned as a minister only upon election by the congregation, which recognized God's call to her to teach." *Id.*  Perich's title and the extensive formal training behind it weighed in favor of applying the ministerial exception.

Third, the Court considered whether Perich "held herself out as a minister of the Church by accepting the formal call to religious service" or "in other ways." *Id.* at 707-08.  It found that she had.  Indicia of this included that Perich took a special housing allowance on her taxes for

those working "in the exercise of the ministry," and that she filled out a post-employment form

describing herself as serving "in the teaching ministry." *Id.* at 708.

> Finally, the Court examined Perich's job responsibilities.  These responsibilities, it found,
>
>> reflected a role in conveying the Church's message and carrying out its mission. Hosanna-Tabor expressly charged her with "lead[ing] others toward Christian maturity" and "teach[ing] faithfully the Word of God, the Sacred Scriptures, in its truth and purity and as set forth in all the symbolical books of the Evangelical Lutheran Church."  In fulfilling these responsibilities, Perich taught her students religion four days a week, and led them in prayer three times a day.  Once a week, she took her students to a school-wide chapel service, and – about twice a year – she took her turn leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible.  During her last year of teaching, Perich also led her fourth graders in a brief devotional exercise each morning.

*Id.* (alterations in original) (citation omitted).  Thus, because Perich was "a source of religious

instruction" and "performed an important role in transmitting the Lutheran faith to the next

generation," her job responsibilities weighed in favor of applying the ministerial exception.  *Id.*

> In reversing the Sixth Circuit's decision, the Supreme Court also provided guidance as to

where the court below had erred.  It explained that the Sixth Circuit did not give enough weight

to Perich's title (including its attendant training and education); "gave too much weight to the

fact that lay teachers at the school performed the same religious duties" as Perich; and "placed

too much emphasis on Perich's performance of secular duties."  *Id.*

> Since *Hosanna-Tabor* was decided in 2012, the Fifth and Sixth Circuits and a handful of

district courts have considered the application of the ministerial exception in a diverse range of

employment discrimination cases.  *See, e.g.*, *Conlon*, 777 F.3d at 833-35 (holding that exception

applied to "spiritual director"); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 176-79 (5th

Cir. 2012) (applying exception to parish's music director); *Rogers v. Salvation Army*, No. 14-

CV-12656, 2015 WL 2186007, at *6-7 (E.D. Mich. May 11, 2015) (ministerial exception applied

to "spiritual counselor"); *Herx v. Diocese of Fort Wayne-S. Bend Inc.*, 48 F. Supp. 3d 1168, 1177

(N.D. Ind. 2014) (finding "lay teacher" to be outside of ministerial exception); *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 711 (D. Md. 2013) (member of janitorial staff of religious institution was not "minister" under exception).  Notably, none of these courts have considered whether a parochial-school principal is a "minister" under the exception, although cases decided prior to *Hosanna-Tabor* found that they were.  *Braun v. St. Pius X Parish*, 827 F. Supp. 2d 1312, 1318 (N.D. Okla. 2011) (citing *Sabatino v. St. Aloysius Parish*, 672 A.2d 217 (N.J. Super. Ct. App. Div. 1996)).

      In any event, in light of the Supreme Court's explicit rejection of "a rigid formula for deciding when an employee qualifies as a minister," *Hosanna-Tabor*, 132 S. Ct. at 707, I must consider the specific circumstances of Plaintiff's employment in concert with the case law discussed above to make this determination.

### B.  The *Hosanna-Tabor* Considerations As Applied to Plaintiff

      As a preliminary matter, parochial schools are considered "religious organizations" for purposes of the ministerial exception.  *See, e.g.*, *Herx*, 48 F. Supp. 3d at 1177 (examining application of ministerial exception to parochial school teacher); *Dias v. Archdiocese of Cincinnati*, No. 11-CV-251, 2013 WL 360355, at *4 (S.D. Ohio Jan. 30, 2013) (same); *cf. Conlon*, 777 F.3d at 833-34 ("It is undisputed that InterVarsity *Christian Fellowship* is a Christian organization, whose purpose is to advance the understanding and practice of Christianity in colleges and universities.  It is therefore a 'religious group' under *Hosanna-Tabor*.") (emphasis in original); *Penn v. N.Y. Methodist Hosp.*, No. 11-CV-9137, 2016 WL 270456, at *3, 5 (S.D.N.Y. Jan. 20, 2016) (viewing ministerial exception on a "sliding scale," where the more religious the employer institution is, the less religious the employee's functions must be to qualify, and finding that hospital is institution to which exception applies).  Because

the School is a parochial school, one purpose of which is clearly to advance the understanding and practice of Catholicism, it is a "religious organization" for purposes of the ministerial exception. The sole remaining question is thus whether Plaintiff is a "minister" under the exception.

I first examine whether Plaintiff was "held out" by the Archdiocese and the School as a minister, "with a role distinct from that of most of its members." *Hosanna-Tabor*, 132 S. Ct. at 707. It is clear from the Archdiocese's description of a principal's position that it does hold principals out as ministers. Unlike other school staff, the principal is required to be a practicing Catholic. (P's Counter 56.1 ¶ 21.) As principal, Plaintiff was tasked with "achieving the Catholic mission and purpose of the school" and being the "animator of the community of faith within the school." (Admin. Manual at 023924.) Further, the principal is described as a religious liaison between the Archdiocese, the parish, the congregation, the students, and the parents, interacting with all entities and fostering a religious community. (*Id.* at 023803.) And, as in *Hosanna-Tabor*, the record indicates that Plaintiff was evaluated by superiors in the Archdiocese, the Monsignor, and her faculty based on, among other things, her effectiveness as a religious leader. (*See* Novikoff Decl. Exs. J-M; Ladolcetta Decl. ¶ 26; McGuirk Decl. ¶ 11; Driscoll Decl. ¶ 24.) These factors demonstrate that the Archdiocese and the school held Plaintiff out as a minister, weighing in favor of application of the ministerial exception.

I next look to Plaintiff's title and the requisite education and training associated with that title. The contract that Plaintiff signed in 2007 was for the position of "Lay Principal." (Ds' Counter 56.1 ¶ 12.) As noted, in order to attain this position, Plaintiff was required to submit a letter confirming that she was a practicing Catholic. (P's Counter 56.1 ¶ 21.) Principals are also, at least in theory, required to complete a Level 1 and Level 2 Catechist Certification Program

within three years of attaining that position, (Admin. Manual at 023808), although Plaintiff maintains (and I assume for purposes of these Motions) that this certification requirement was not strictly enforced.  (P's Counter 56.1 ¶ 18.)  Plaintiff's academic credentials are in education, and she does not have formal training in religion or theology. (*See* Ds' Counter 56.1 ¶ 4.)  Plaintiff's title and training are thus different from some other employees who fell within the ministerial exception.  Unlike those cases that involved "called teachers," a "spiritual director," or a "spiritual counselor," for instance, there is nothing inherently religious about the title "Lay Principal."  *Compare, e.g.*, *Hosanna-Tabor*, 132 S. Ct. at 707 ("called teacher"), *Conlon*, 777 F.3d at 834 ("spiritual director"), *and Rogers*, 2015 WL 2186007, at *6 ("spiritual counselor"), *with Herx*, 48 F. Supp. 3d at 1177 ("lay teacher").  And while principals must attest to their Catholic faith and it is at least suggested that they complete Catechist certification, nothing in the record suggests the rigorous level of education, training, and certification attained by plaintiffs such as Perich or other "called" teachers.  *See Conlon*, 777 F.3d at 835.  This factor in the inquiry therefore weighs against application of the ministerial exception.  *See id.*

I next turn to whether Plaintiff "held herself out as a minister of the Church by accepting the formal call to religious service," *Hosanna-Tabor*, 132 S. Ct. at 707, or "in other ways," *id.* at 708.  The Supreme Court in *Hosanna-Tabor* and the Northern District of Illinois in *Herzog v. St. Peter Lutheran Church* both found that "called teachers" had accepted a formal call to religious service by virtue of their positions and held themselves out as ministers as evidenced by, for example, taking special housing allowances on taxes for those working "in the exercise of the ministry."  *Hosanna-Tabor*, 132 S. Ct. at 708 (internal quotation marks omitted); *see Herzog v. St. Peter Lutheran Church*, 884 F. Supp. 2d 668, 673 (N.D. Ill. 2012).  Plaintiff did not accept any such formal call, nor did she claim ministerial status for tax or other formal purposes, so this

20

factor weighs against the exception.  But it does not weigh strongly because Plaintiff undoubtedly knew she would be perceived as a religious leader.  The Archdiocese describes acceptance of the principal position as "accept[ing] the vocation and challenge of leadership in Catholic education."  (Admin. Manual at 023753.)  Whether Plaintiff ever saw this description of the position or not, she had to verify her Catholic practice and answer questions about her Catholic leadership and vision when applying for the position.  (Cassel Decl. ¶ 11.)  In accepting this "vocation," Plaintiff became the head of an undeniably Catholic institution.  And the record demonstrates that Plaintiff held herself out to the school community as a religious authority in many ways – for example, by leading prayers for the student body and teachers, conveying religious messages in speeches and writings, and expressing the importance of Catholic prayer and spirituality in newsletters to parents.  So while Plaintiff did not claim the formal trappings of a ministerial position, and while she had many secular responsibilities, she knew that in some of her public functions she would be part of "the critical process of communicating the faith," *Hosanna-Tabor*, 132 S. Ct. at 712 (Alito, J., concurring), and would "personify [the Church's] beliefs," *id.* at 706 (majority opinion); *see id.* at 711 ("[I]t would be a mistake if the term 'minister' or the concept of ordination were viewed as central . . . .  Instead, courts should focus on the function performed by persons who work for religious bodies.") (Alito, J., concurring).

Fourth, I must examine whether Plaintiff's job responsibilities "reflected a role in conveying the Church's message and carrying out its mission."  *Id.* at 708 (majority opinion).[12] The record clearly indicates that Plaintiff filled such a role from the beginning of her tenure as principal at the School.  Early on, Plaintiff instituted a new system of daily prayer in the morning to get students more involved.  (P's Counter 56.1 ¶ 66.)  Plaintiff would lead prayers with the

---

[12] As discussed, this does not require that an employee stand in front of a congregation and lead mass.  *See, e.g.*, *Conlon*, 777 F.3d at 835; *Cannata*, 700 F.3d at 178-79.

21

school body over the loud speaker.  (*Id.* ¶¶ 69-71, 85-89.)  She was at the front and center of

planning and facilitating special services for the Feast of St. Anthony and the September 11

memorial.  (*Id.* ¶¶ 114-15.)  Additionally, Plaintiff encouraged and supervised teachers'

integration of Catholic saints and religious values in their lessons and classrooms.  (*Id.* ¶¶ 91, 93-

94, 97.)  Even outside the walls of the School, Plaintiff kept families connected to their students'

religious and spiritual development through the school newsletter.  (*Id.* ¶¶ 118-23.)  And at the

end of each school year, Plaintiff sent eighth-grade students forth with a religion-infused

commencement speech and yearbook message.  (*Id.* ¶¶ 83, 124; *see* Novikoff Decl. Ex. Q; *see*

*also* Weber Decl. ¶ 12; *id.* Ex. B.)  Not only did Plaintiff do all of these things, but she was

evaluated on how well she did them.  (*See* Novikoff Decl. Exs. J-M; Ladolcetta Decl. ¶ 26;

McGuirk Decl. ¶ 11; Driscoll Decl. ¶ 24.)  There can be no doubt that Plaintiff's job

responsibilities included "conveying the Church's message and carrying out its mission."

*Hosanna-Tabor*, 132 S. Ct. at 708.  Through her efforts in "fostering a Christian atmosphere" in

the School, (Novikoff Decl. Ex. J), "renewing [its] Catholic identity," (*id.* Ex. K), leading

prayers and sharing Catholic values, Plaintiff "serve[d] as a messenger or teacher of [the

Church's] faith."  *Hosanna-Tabor*, 132 S. Ct. at 712 (Alito, J., concurring).  Accordingly, this

factor weighs strongly in favor of application of the ministerial exception.

     Plaintiff's arguments against applying the ministerial exception are unpersuasive.  As

*Hosanna-Tabor* and other case law instructs, it does not matter what percentage of time Plaintiff

spent on secular or administrative matters as compared to leading prayer or otherwise conveying

the message of the Archdiocese and Catholic church, nor does it matter that other "lay" teachers

engaged in similar religious activities as Plaintiff.  *See id.* at 708-09 (majority opinion); *Preece*,

2015 WL 1826231, at *5; *Herzog*, 884 F. Supp. 2d at 674.  The argument that Plaintiff was

acting at the direction of the Archdiocese and the Monsignor is similarly unpersuasive.  Were this determinative, none of the plaintiffs in the cases discussed above would fall under the ministerial exception.  *See Hosanna-Tabor*, 132 S. Ct. at 708; *Conlon*, 777 F.3d at 835; *Cannata*, 700 F.3d at 178-79; *Rogers*, 2015 WL 2186007, at *6-7; *Preece*, 2015 WL 1826231, at *5; *Herzog*, 884 F. Supp. 2d at 674.  And Plaintiff's continued attempt to rely on canon law, (*see* P's Mem. 9-12), is misplaced, as I have previously held.  There is no dispute that Plaintiff is not a member of the clergy and that she would not be considered a minister for purposes of Church governance.  But the issue here is one of U.S., not canon, law, and "minister" for purposes of the ministerial exception has a far broader meaning than it does for internal Church purposes. Finally, Plaintiff's suggestion that application of the ministerial exception in a case such as this would open the door to a "parade of horribles" has been rejected by the Supreme Court.  *See Hosanna-Tabor*, 132 S. Ct. at 710.

Considering the factors discussed in *Hosanna-Tabor* and the totality of Plaintiff's circumstances of employment, I find on balance that the ministerial exception applies.  While Plaintiff's title and attendant training and education weigh against application of the exception, and while Plaintiff's not claiming to be a minister weighs slightly against it as well, the other factors discussed above – the distinct ministerial role the Church assigns her and, most significantly, Plaintiff's job responsibilities – carry far more weight.  And as the Supreme Court has cautioned, the inquiry is not intended to consist of a "rigid" checklist but is instead a holistic examination of an employee's circumstances.  *Id.* at 707-08; *see Cannata*, 700 F.3d at 176 ("Any attempt to calcify the particular considerations that motivated the Court in *Hosanna-Tabor* into a 'rigid formula' would not be appropriate."); *id.* at 177 (application of exception does not depend on finding that Plaintiff satisfies same considerations that motivated finding in *Hosanna-Tabor*);

23

*see also Conlon*, 777 F.3d at 835 (applying the ministerial exception even though not all *Hosanna-Tabor* factors were satisfied). While Plaintiff may not regard the religious aspect of her job as nearly as significant as the secular aspects, there can be no real doubt that Plaintiff "furthered the mission of the church and helped convey its message." *Cannata*, 700 F.3d at 177.

Accordingly, Defendants have carried their burden of establishing on the undisputed facts that Plaintiff falls within the ministerial exception to Title VII, and summary judgment in favor of Defendants is appropriate.

### C.  Plaintiff's State-Law Claims

In addition to her federal antidiscrimination and retaliation claims, Plaintiff further alleges violations of New York State Executive Law section 296 *et seq.* and breach of contract. (AC ¶¶ 206-29.) The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that all of the claims over which this Court has original jurisdiction should be dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law causes of action. *See id.* (citing 28 U.S.C. § 1367(c)(3)).

## IV.  <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion for summary judgment is GRANTED and Plaintiff's Cross-Motion to strike Defendants' ministerial-immunity defense is DENIED. The federal claims are dismissed with prejudice and the state claims are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs. 90, 103), enter judgment for Defendants, and close the case.


**SO ORDERED.**


Dated: March 29, 2016
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.